Please call the last case for argument this afternoon. Yes, Your Honor. The final case, case number 19-2582, Southern Iowa, United States v. Nadine Robinson. We're ready to proceed. Thank you, Your Honor. John Mohler on behalf of Nadine Robinson. This case involves personal information that was stolen from the University of Iowa. The information was personal identifying information such as names and social security numbers. With this personal information, someone was able to tax refunds in front of or prior to the actual proper person filing the return. It appears the numbers were probably just picked out of the air. Most of them were in the $50,000 range and the refunds are supposed to be about $8,000. Now in order to secure the funds, some persons somewhere were purchasing these green dot or money storage or debit type cards where you can buy them in advance and you can reload them. Then they arranged to have those cards notated with the tax returns recipient's name and address and they're watching and as the refunds are coming, they're noticing the money on the card and the object is get that money transferred off the card right away, otherwise somebody's going to find it. In this case, most of the people were buying Walmart, MoneyGram, Western Union type travelers or regular trucks with those cards. An approximately $75,000 loss. It was determined by the IRS accountant that there was a total of $215,000 loss related to University of Iowa refunds that were traced to Azalea. Azalea is one of these money market services that are provided to people that don't customarily have banking accounts. We all have banks and credit cards, but there are a lot of people that through credit or move or writing bad checks, they don't have access. So these money cashing places become their lifeline. So they came up with $215,000 of University of Iowa refunds went to or through the Azalea credit union or money services business, I should say. And then the report showed that there was a $474,000 loss to the IRS. The defendant asked for some reason for a forfeiture hearing. At issue in the forfeiture hearing was whether the government could link the purchase of a home to the money and to the crime. And that matter was set for a hearing and both parties filed motion briefs and the post trial briefs concerning the court's decision. And the court did not surprisingly ruled that the house was forfeited that there was a sufficient nuxus. There was a process issue. I realized that your client may not have had noticed that this would have implications beyond the forfeiture hearing. But you've at least had your clients had an opportunity to be heard. You just highlighted all the different ways the district court heard your client and her position on on on what to form on what was forfeited. That's what is disturbing your honor because I think she thought the controversy was a $150,000 home and that's what the parties prepared for and they didn't prepare for a sentencing hearing. So for the court at a forfeiture hearing to make a finding without any requests by or any notice to either party. Here's my finding and then the pre-sentence investigation your honor there Mr. Cronk argues that this number was mentioned from the agent's apparently but that evidence by itself is not evidence. I think Mr. McAtee and my client should have been on notice we're determining the offense level conduct and they weren't. They walked into a hearing thinking that this is a five-year sentence and the sentence was in essence doubled when the court finding was made. Would you propose having another hearing then? I mean you know I understand that the district court probably could have provided notice hey this is going to matter for the offense level as well but it seems silly for the district court then to have another hearing and hear the same evidence and then you know the district court's not going to make the same you know it's not going to change his ruling if she's making. Your honor I don't want to go too far beyond the record but I think if you read the forfeiture hearing the only evidence introduced was the IRS agent's opinion. He's an accountant he has no background in money service businesses there was no comparison of her business to any other such business. We had just this month a report leaked about two trillion dollars of suspicious activity reports from the major banks in the world. You can make an argument that all the money in the appears but there was no effort by her attorney there were no witnesses called there were no specialists there were not even an aggressive attack on the IRS agent because I think the focus was can we link this gift money does this link up to a nuxtious to the home and I think. Let me ask what happened then at the sentencing as I understand I and I think I understand what you're saying that the forfeiture hearing was really focused on the home the other testimony kind of came in and it's I think the government would say established this other issue what about what happened at sentencing when defense counsel basically said well I think that that issue has been determined at the forfeiture hearing we have the we have our same objection which is it still that's interesting and I've tried to think what I would do in that situation and I've never seen one like this yet. Mr. Kroc picked up on this and in his sentencing brief says hey the court's already decided this and then Mr. McAtee came in and said I agree factually with the report but I'm still disagreeing with your legal conclusions and findings and he's talking about when the court asks do you object to the base offense level and he says I do your honor for the record and then the court asked him can you help me understand that with the facts and the records I'm objected to as to the amount of the loss here in terms of the amount of money that was laundered here she's focusing on the laundered money and not necessarily the underlying crime. Mr. McAtee says our objection again is speculative as the court noticed but then he seems to concede I'm aware your honor the the court has indicated I'm not going to change my mind and I'm not sure if he's supposed to fight with the judge and say darn it judge I'm entitled to a hearing and I'm ready to go and I would like to do this certainly have given the opportunity I think there's a more strategic defense that should be made to challenge this I'm objected to testimony of the agent so to some extent I'm touching into a touching into that situation. You know in light of your response are we in plain air land here then because as judge I noticed that as well as Judge Kelly mentioned the speculation was the objection not hey I should get a more comprehensive hearing or I that allows me to disprove what's in the PSR and what's already been established. And this is where I think all three the court and the attorneys missed the requirements of 32 sub I.B. which says those are to be determined at a sentencing you don't have this low risk forfeiture hearing I mean relatively comparatively low risk forfeiture hearing that you think you're this is a death penalty case that was one of the cases I cited so that's what makes it so shocking is 50 or 60 months to 10 years was at stake and I don't think Mr. McAtee Mr. Cronk or the court anticipated that determination was going to be made at this hearing the forfeiture hearing. I think I probably reserved a minute or two unless there's any questions I'll reserve the rest. You may. Mr. Cronk. May it please the court good afternoon my name is Cliff Cronk I'm the assistant United States attorney that handled this case. There's a glaring misstep here and that is that first of all the initial draft of the pre-sentence report came out in December of 2018. The initial draft of the pre-sentence report attributed all of this money from those 2 accounts essentially not all of it almost all of it to Azalea and Ms. Robinson and page 21 of the draft of the pre-sentence report paragraph 98 it specifically adds 28 levels based on the amount of laundered funds was already sitting there needing to be decided. This case was a has a narrative indictment in it it describes in good detail as Mr. Mueller sort of reiterated how this fraud was committed and in the discovery the defendants had all or the defendant had all of the tax returns all of the bank statements all of the debit card accounts all of the deposit items which is 5,000 money orders roughly and could not find a legitimate money order that went into that account there the total amount of deposit items that were money orders and nice round numbers cashed at Azalea in sequential order that there's just no factual issues about what this business was for how much money went through it and the fact that it was a business engaged in laundering funds and that the laundered funds total more than $3.5 million dollars in fact it's close would you would you agree Mr. Krunk that the forfeiture hearing or how about this do you agree with Mr. Mueller that the focus of the forfeiture hearing really was the $150,000 home and that this idea of the total quantity was not at issue such that the parties were questioning directly the agent about that issue? I would take some issue with that first of all we were trying to establish that all the money in the account was dirty and that was well known ahead of time and Mr. McAtee knew that and the government knew that the we wanted to show that virtually the entire account was set up for the purpose of laundering funds and as you would see from the record and if you look at the spreadsheets that were provided to the court and testified to by the agent he went through every single one of these deposit items he looked at every single money order and he described exactly how this fraud was committed not just in his testimony but through through the you know if you look at the plea agreement of course there's a large amount of admissions made by Miss Robinson about what this business was for that these money orders were dirty it wasn't a surprise to Mr. McAtee or me that we were talking about all the money in the account essentially being part of this business of wandering funds that it was going to was that your approach is that how you went about what is it fair to say that that you went into the forfeiture hearing with the goal of of establishing for the court that the vast majority of the money that went through this business was dirty so therefore the $150,000 home had to be included in that instead of coming at it directly at the $150,000 home? Well it was both because uh if you the forfeiture both came from dirty money but also there was a bank fraud type of thing involved in shifting the money to Mr. Koloko's account to show that he was putting up a false gift letter claiming that he had the money and that's another further money laundering act that made the property involved in money laundering as well as being proceeds so we had both theories that all the money in the account was dirty and also that they did other acts of money laundering to uh to make the property dirty in two different ways. So I'm back to this notice issue of course we're talking about a the plea agreement actually mentions the value of laundered funds being something the court was going to have to decide that's in the plea agreement then the draft of the pre-sentence report comes out and it identifies specifically in December of 2018 all this money is going to increase the offense level by 18 levels so a total of 26 that's in the draft then there's an objection to it then there's the forfeiture hearing there's nothing devious about the court explaining on the record that this her findings may be relevant to the final draft of the pre-sentence report of course the final draft comes out the defendant has had opportunity after opportunity after opportunity to put on any contrary evidence including at the forfeiture hearing including at the sentencing hearing the fact is there wasn't any contrary evidence and and Ms. Robinson is in the same every other defendant who who goes through this system uh this federal system the notice requirements are met when you're provided ahead of time what the uh pre-sentence report says you're allowed an opportunity to rebut that with any any evidence you have and in this case the only only thing that they wanted to object to was the fact that it wasn't all the money and I'll concede that it wasn't all the money but it was almost all the money and that's what the court found and there was no real con contest as to whether it was more more than three and a half million because it's over four million and in fact it's upwards of five million um so we're not talking about a miscalculation in terms of the financial part and this idea that the IRS agent wasn't qualified he he actually did the analysis he went through every money order he noted when they were purchased when they were cashed the payee names on them he went back and checked where that many of them came from some of them outside of our Iowa victims there's no argument that it's not relevant conduct uh there's just simply nothing here I'll concede the rest of my time there's no other questions I see none thank you Mr. Muller I think your mute button may still be on thank you we'll get I'm sorry yeah we'll give you about a minute if you need it thank you the IRS agent was thoroughly looking at the checks related to the Iowa situation in his testimony he described sampling two other checks the IRS agent's fundamental premise is that if money orders are sequential and if they're bound numbers that they're fraudulent well if it was fraudulent money orders when they came to Azalea they were fraudulent when they were being issued in sequence for round dollar amounts and in essence if the IRS agent was correct every check money order money service type bank would be a fraudulent transaction and that's what's wrong he talks about sampling he's not a statistician there's no explanation of sampling his conclusions are coming out and they really don't make much difference to the house ruling and forfeiture and then whether Terry got discouraged and said the judge has already made up her mind she's told me I'm not changing my mind at sentencing we're not going to do this she denied him an opportunity that 32 rule 32 is to give thank you young man thank you both for your arguments here this afternoon and we appreciate your willingness to appear by video we will take the matter under advisement